UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 16-10233-RGS

UNITED STATES

v.

DONNA ACKERLY, CHARLES W. GARSKE,
RICHARD J. GOTTCENT, AND MICHAEL SEDLAK

ORDER ON MOTION OF DEFENDANTS CHARLES W. GARSKE,
RICHARD J. GOTTCENT, AND MICHAEL SEDLAK TO DISMISS THE
INDICTMENT UNDER THE DOUBLE JEOPARDY CLAUSE

August 16, 2018

STEARNS, D.J.

When viewed from a higher orbit, the matter presently before the court involves a tension between rights conferred by the Federal Rules of Criminal Procedure and the United States Constitution. From a more earthly vantage, it involves the clash between a criminal defendant's interest in being free on the one hand from undue oppression by the State, and on the other, the Sovereign's interest in pursuing just punishment.

To begin: Federal Rule of Criminal Procedure 23(b)(2) permits a criminal jury trial to continue to a verdict with fewer than twelve jurors only with consent of all parties (and the court's approval), while the Fifth Amendment to the United States Constitution, among its other limitations on the power of the State, provides that "nor shall any person be subject for

the same offence to be twice put in jeopardy of life of limb."[1]  As will be explained, despite the simplicity of its wording, the Double Jeopardy Clause of the Fifth Amendment has many facets.  It protects a defendant not only from being subjected to multiple trials and multiple punishments for the same offense; it also preserves a defendant's "valued right to have the trial concluded by a particular tribunal," *Arizona v. Washington*, 434 U.S. 497, 505 (1978), including the right to "hav[e] his case finally decided by the jury first selected" to hear his case.  *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982).

The factual underpinning of this case can be summarized as follows.  Over the weekend preceding what was expected to be the last day of evidence in a multi-week trial involving four alleged co-conspirators in a scheme to deprive a stock proxy tabulation firm of the honest services of one of its employees, the twelfth remaining juror was excused after his wife was stricken with a grave medical emergency.[2]  The government initially agreed to go forward with eleven jurors, but then added the condition that it would

---

[1] The prohibition against double jeopardy is recognized as a "universal maxim of the common law."  4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *335 (Claitor's ed., Baton Rouge, LA 1976).

[2] The trial had begun with fourteen jurors.  One failed to report for jury duty on the second day of trial.  A week later, the remaining alternate was excused after learning that he had been diagnosed with a recurrence of leukemia.

only agree if all four co-defendants also agreed.   Three of the co-defendants did so, but one declined.  After much back-and-forth over the weekend, the government and the fourth co-defendant refused to relent (positions iterated on Monday morning), leaving the court with no practicable option under the plain text of Rule 23 but to declare a mistrial.[3]

And so the question under the peculiar facts of this case is this:  Does the Double Jeopardy Clause bar the government from retrying the three defendants – Charles Garske, Richard Gottcent, and Michael Sedlak – who sought to proceed to a verdict validated by eleven jurors?  While the answer is a difficult one, the court concludes that it does, for reasons that will be explained, necessarily at some length.

## FACTS AND OVERVIEW

This case arose out of an investigation involving an alleged bribery scheme affecting the proxy solicitation industry.   Defendants were employees of Georgeson, Inc., a firm that specializes in advising clients on positions that institutional investors are likely to take in voting their proxies on the governance proposals offered by corporate management and shareholders.  To enhance the quality of their predictions to their clients,

---

[3] The three consenting defendants preserved their right to object to any retrial as a violation of their rights under the Double Jeopardy Clause.  *See* Tr. Mar. 19, 2018, at 6:16-7:17.

defendants are alleged to have corrupted an insider at Institutional Shareholder Services, Inc. (ISS), a proxy advisory firm, by plying him with meals and tickets to sporting events and concerts.[4]  The object was to gain access to the proxy voting advice that ISS was giving to its institutional clients.  The indictment was handed up on July 11, 2016.  The court ruled on various pretrial motions, including, most notably for present purposes, two unsuccessful attempts by defendant Donna Ackerly to sever her trial from that of her three co-defendants.  *See* Dkt # 235 (Nov. 14, 2017), Dkt # 331 (Feb. 21, 2018).

The trial began on February 26, 2018, with fourteen jurors impaneled.  As previously noted, on March 1, 2018, the remaining alternate juror was excused for cause.  In granting the excusal, the court, in an exercise of misplaced optimism, observed that "under the . . . rules, 11 is sufficient for a jury, 10 if everyone consents to it.  So I think we'll be okay."  Tr. Mar. 1, 2018, 163:8-10.  Despite four interruptions caused by snow emergencies, the trial progressed to what proved to be its penultimate day on Friday, March 16, 2018.  At a conference held after the jury had been excused for the weekend, defendants' counsel informed the court that they did not intend to call any

---

[4] Over the four and one-half years of the duration of the alleged conspiracy, the gratuities amounted to some $12,000 total in face value.

witnesses, meaning that the case would go to the jury the coming Monday or Tuesday.

The precipitating event leading to the mistrial came on the evening of Friday, March 16, 2018. Juror No. 12[5] contacted the Chief Law Clerk to report that his wife had just been diagnosed with a brain tumor and required immediate surgery. The juror, who was in a state of shock and understandable anguish, stated that he had an urgent need to attend to his wife and children and was unable to continue his jury service.

The next morning, Saturday, March 17, I instructed the Chief Clerk to email the parties and inform them of the turn of events. I also asked her to relay my observation that Federal Rule of Criminal Procedure 23(b)(2)(B) "allows a reduction to 11 jurors with the written consent of the parties and the judge," and to advise the parties that I was "prepared to make the necessary finding of good cause and [that I] look[ed] to the parties to agree." *See* Dkt # 416-2. At 10:32 a.m. she did so. Counsel for defendant Gottcent replied at 10:38 a.m. stating that his client was prepared to go forward with eleven jurors. Dkt # 416-3. The government replied at 12:18 p.m. stating that it consented to "proceed with 11" jurors. *See* Dkt # 416-5. At 2:44 p.m., counsel for defendant Sedlak agreed to proceed with eleven jurors. *See* Dkt

---

[5] A pseudonym to protect the juror's privacy.

# 416-6.  The government then sent an email at 2:52 p.m. to all parties "clarifying" its original assent and announcing that "the government's consent is conditioned on all four defendants consenting."  *See* Dkt # 416-7.  Counsel for Garske forwarded her client's consent at 3:06 p.m.

The bump in the road was felt at 4:15 p.m., when counsel for Ackerly wrote to all parties stating that his client was "not comfortable consenting to go with only 11 jurors."  *See* Dkt # 416-9.  The email referenced Ackerly's previous attempts to have her case severed from her three co-defendants, arguing that the government's remaining witnesses would "not offer any evidence against her," *id.*, and that the evidentiary record was complete with respect to her planned motions for a directed verdict, or alternatively, to exclude certain of the out-of-court statements of her alleged co-conspirators pursuant to *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).  She requested a hearing on these motions the following Monday morning.  The government responded thirteen minutes later, objecting to the assertion that the record as it pertained to Ackerly was complete and stating that it was "puzzled by [Ackerly's] reference to severance.  Certainly it would be terribly inappropriate to use this circumstance in an attempt to achieve that result."  *See* Dkt # 416-10.

The court denied Ackerly's request to be heard on the directed verdict and *Petrozziello* motions, *see* Dkt # 416-11, and then explained to the parties that, in light of "the government's second email [from 2:52 p.m., *see* Dkt # 416-7] that they only consent if all four defendants consent . . . the court feels it has no other choice than to declare a mistrial on Monday morning." *See* Dkt # 416-12.  The following day, Sunday, March 18, 2018 at 12:36 p.m., counsel for Ackerly wrote in an email (purportedly on behalf of all four defendants) that "the Government's change in position that it will refuse to proceed with the trial against the three defendants if Ackerly exercises her right to a jury of 12, will create a double jeopardy problem that would prevent the retrial of the other three defendants." *See* Dkt # 416-13.  In that email, Ackerly again requested a severance and proposed that the "three other defendants and the government should be ready to proceed with trial at 9 am tomorrow [Monday]." *Id.*  Counsel for Garske replied to the email, stating that Ackerly "does not speak for defendants Garske, Gottcent and Sedlak," and emphasizing that these three defendants "have consented to a jury of eleven . . . and their decisions were made without regard to [Ackerly's] possible course of action." *See* Dkt # 416-14.  The court responded that it understood the parties' respective positions.  *See* Dkt # 416-15.

Court convened Monday morning, March 19, 2018, without the jury present. The Chief Law Clerk summarized her conversations with Juror No. 12. I then explained to the parties that "consistent with [Fed. R. Crim. P.] Rule 26.3," I had considered other possibilities than a mistrial, but the "only alternative I can think of is to just indefinitely postpone the trial and try to resume at some point in the future." Tr. Mar. 19, 2018, at 6:1-3. However, I further explained that because there was no way of knowing when Juror 12's wife's "operation will take place, or even what its outcome will be, and the likelihood, it being brain surgery, of extended convalescence," I did not believe that the court was in a position to "keep tabs on the remaining jurors and everyone else in a fashion that would actually allow the trial to be concluded in an orderly fashion." *Id.* at 6:6-12. As I deemed Rule 23 to be "as clear as a rule could be" in requiring the consent of all parties to go forward with less than twelve jurors, and since the government and Ackerly remained at loggerheads, there was "no power that I see, or discretion that I have, under the rule to force a different result." *Id.* at 5:15, 19-21. I invited the parties to suggest other ideas, but none were forthcoming. Counsel for the three defendants who were willing to proceed – Gottcent, Garske and Sedlak – iterated their desire to proceed with eleven jurors, while stating on

the record that they would be raising a double jeopardy bar in the event of a retrial.  Hands tied, I declared a mistrial and discharged the jury.

Defendants Gottcent, Garske and Sedlak now formally move to dismiss the indictment under the Double Jeopardy Clause.  *See* Dkt # 416.  The court welcomed supplemental briefing on this issue, and heard argument on the Motion on July 17, 2018.

## DISCUSSION

The court offers a few words first about the origins of the traditional principle that a jury is to consist of twelve individuals – a principle embedded in federal criminal trial practice, but one that has no independent, constitutional significance.

### A.  Jury Size

The jury of twelve is a vestige of English common law that carried over into the colonial and later the American legal system more as a matter of tradition and habit than of *opinio juris sive necessitatis.*  The Sixth Amendment, while guaranteeing the common-law jury trial right, is silent on the question of how many persons need be present to constitute a constitutionally acceptable jury.  The Supreme Court in the late nineteenth and early twentieth centuries articulated the view that the jury of twelve, perhaps by adverse possession, had found its way into the United States

Constitution.  *See, e.g., Patton v. United States*, 281 U.S. 276, 292 (1930) ("A constitutional jury means twelve men as though that number had been specifically named; and it follows that, when reduced to eleven, it ceases to be such a jury quite as effectively as though the number had been reduced to a single person.").

Forty years later, however, so much of *Patton* that purported to constitutionalize the jury of twelve was repudiated in *Williams v. Florida*, in which the Supreme Court concluded that "the fact that the jury at common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance 'except to mystics.'" 399 U.S. 78, 102 (1970) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 182 (1968) (Harlan, J., dissenting)).  The Court found that while the jury should be "large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community," there was "little reason to think" that the grand purpose of committing decisions of life, liberty, and property to the verdict of the community, was "in any meaningful sense less likely to be achieved when the jury numbers six, than when it numbers 12 — particularly if the requirement of unanimity is retained."  *Williams*, 399 U.S. at 100.  "To read the Sixth Amendment as forever codifying a feature [12

jurors] so incidental to the real purpose of the Amendment," the Court concluded, "is to ascribe a blind formalism to the Framers which would require considerably more evidence than we have been able to discover in the history and language of the Constitution or in the reasoning of our past decisions." *Id.* at 102-103.

### B. Federal Rule of Criminal Procedure 23

Notwithstanding the lack of any mooring in the Constitution, the jury of twelve is enshrined in the Federal Rules of Criminal Procedure as the presumptive minimum. *See* Fed. R. Crim. P. 23(b)(1) ("A jury consists of 12 persons unless this rule provides otherwise.").  The Rule further provides that "[a]t any time before the verdict, the parties may, with the court's approval, stipulate in writing that: (A) the jury may consist of fewer than 12 persons; or (B) a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins." Fed. R. Crim. P. 23(b)(2).  The plain text of the Rule establishes that all parties must consent to a jury of less than twelve in federal criminal trials. There is one exception:  where a case has been submitted to the jury for a verdict, the "court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed. R. Crim. P. 23(b)(3).  However, the Rules do not permit a trial

judge to force a non-consenting party to proceed with a jury of less than twelve prior to the commencement of deliberations.

The government, in other words, under the plain text of the Rule, was within its rights to refuse consent to proceed to a verdict with only eleven jurors. The moving defendants argue, however, that by conditioning its consent on the reciprocal consent of all four co-defendants, and then by refusing to proceed to verdict with a jury of eleven against the three consenting defendants, the government in effect "caused the mistrial." Defs.' Mem., Dkt # 417 at 12. In support of that argument, defendants rely on *United States v. The Larouche Campaign*, a First Circuit case written by then-Judge Breyer, in which the court held that the defendants' refusal to go forward with a jury of ten "differ[ed] in no significant way from a case in which a defendant says the words 'I want a mistrial,' and we must treat it similarly." 866 F.2d 512, 514 (1st Cir. 1989). There is, however, a significant factual dissimilarity between that case and this one: in *Larouche,* the defendants had affirmatively requested the excusal of five jurors on hardship grounds and then, once the request was granted by the trial judge, reneged by refusing to proceed with the ten jurors that remained.

Here, by contrast, the juror's excusal was caused by a *force majeure* beyond the control of the parties and the court. Thus, I agree with the

government that it is unfair to say that it caused the mistrial "any more than [to say] that Defendant Ackerly forced the mistrial," Gov't's Opp'n, Dkt # 426 at 14, as both were exercising a right granted to them by Rule 23.  There are instances in which the government has been found to have engaged in conduct intended to goad a defendant into moving for a mistrial, *see Oregon v. Kennedy*, 456 U.S. 667, 676 (1982), or where the government was found to have refused consent to go forward with eleven jurors because it was not sanguine about its chances of winning a conviction, *see United States v. Banks,* 383 F. Supp. 389 (D.S.D. 1974), *aff'd sub nom. United States v. Means*, 513 F.2d 1329 (8th Cir. 1975).  Here, however, the government's conduct is not infected with any hint of improper motive, whatever one might think of the strategic wisdom of the choice it made.

In the attempt to identify an improper motive, defendants contend that the government's decision to withhold consent was animated by a desire to deny Ackerly the severance that she had sought on several occasions.  This may well be true, but the law has long countenanced the sentiment that those "indicted together [should be] tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources." *United States v. Soto-Beniquez*, 356 F.3d 1, 29 (1st Cir. 2003).  Moreover, Rule 23 permits the

government to exercise its right to withhold consent without requiring any explanation or justification of its reasons for doing so.

The government understandably would have the discussion begin and end with Rule 23, arguing in its opposition that it "cannot be punished for exercising a statutory right given to it by the rules promulgated by the Supreme Court of the United States." Opp'n, Dkt # 426 at 15.  There is, however, a countervailing argument.  The issue is not one of punishing the government, or anyone else for that matter; rather, the issue is one involving a fundamental principle of constitutional supremacy: "[W]here a constitutional right comes into conflict with a statutory right, the former prevails."  *Gray v. Mississippi,* 481 U.S. 648, 663 (1987).  It is entirely possible to follow the letter of the Federal Rules and still run afoul of the Constitution's prohibition against double jeopardy.  And it is to that subject that I will now turn.

## C.  Double Jeopardy

Judge Henry Friendly aptly noted that "[w]hile the precise origin of the protection against double jeopardy is unclear, it is certain that the notion is very old," *United States v. Jenkins*, 490 F.2d 868, 870 (2d Cir. 1973) (Friendly, J.).  The history of the double jeopardy bar is of more than academic significance, as it is the key that unlocks an informed

14

understanding of its modern-day constitutional content.  *See, e.g., Green v. United States*, 355 U.S. 184, 201-202 (1957) (Frankfurter, J., dissenting) ("Since the prohibition in the Constitution against double jeopardy is derived from history, its significance and scope must be determined, 'not simply by taking the words and a dictionary, but by considering [its] origin and the line of [its] growth.'") (quoting *Gompers* v. *United States*, 233 U.S. 604, 610 (1914)); *Bartkus v. Illinois*, 359 U.S. 121, 152 (1959) (Black, J., dissenting) ("Fear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization.").

    1.  <u>Historical Overview</u>

Early western legal systems considered the concept of double jeopardy as a form of *res judicata* that applied in both civil and criminal contexts.  *See Jenkins*, 490 F.2d at 870 (quoting 1 Demosthenes 589 (Vance trans. 1962)) ("[T]he laws forbid the same man to be tried twice on the same issue, be it a civil action, a scrutiny, a contested claim, or anything else of the sort."). Cicero vaunted the universality of the prohibition among the civilized nations: "Nor is it one thing at Rome and another at Athens, one now and another in the future, but among all nations it is the same."  Charles E. Batchelder, Former Jeopardy, 17 AM. L. REV. 735, 749 (1883).

Even in the grip of the Dark Ages, "when so many other principles of justice were lost, the idea that one trial and one punishment were enough remained alive through the canon law and the teachings of the early Christian writers," *Bartkus*, 359 U.S. at 152 (Black, J., dissenting), for "not even God judges twice for the same act." *Id.* at 152 n.4 (collecting sources).  During the thirteenth century, as Judge Friendly noted, "[s]ince many criminal offenses were tried by battle between the wronged party and the alleged offender, it was evident that a series of prosecutions would ultimately produce a 'conviction' against all but the hardiest combatants, if enough 'appealors' were willing to try their hands at the case."  *Jenkins*, 490 F.2d at 871 (citing 2 Bracton, On the Laws and Customs of England 391 (Thorne trans. 1968)).

By the time of Chief Justice Coke, the double jeopardy principle had been distilled as common-law pleas limiting the power of the Crown.  The first such plea was *autrefois acquit*, under which a defendant could defeat a second trial by showing that he had been previously acquitted of the same offense.  3 Coke, Institutes of the Laws of England 213-214 (1797 ed.).  The second plea, *autrefois convict*, gave similar effect to a former conviction.  *Id.*[6]

---

[6] These common-law pleas were largely adopted by the American colonial courts.  For example, The Body of Liberties of Massachusetts (1641), clause 42, provided that "No man shall be twise sentenced by Civil Justice for one and the same Crime, offence, or Trespasse."  *See also* The Laws and Liberties of Massachusetts (1648) (Farrand ed. 1929) ("everie Action * * * in

Against these pleas the Crown had but two affirmative defenses: a defect in the indictment on which the defendant was first tried; or a prior conviction (or acquittal) rendered by a court of incompetent jurisdiction.[7]  *See Vaux's Case*, 76 Eng. Rep. 992 (Q.B. 1591).

As double jeopardy evolved in the common law, it began to be applied more broadly as a bar not only to a second prosecution, but also in some circumstances to any retrial of an offense.  As the Supreme Court observed in an 1873 double jeopardy case, albeit with some historical imprecision: "The common law not only prohibited a second punishment for the same offence, but it went further and forbid a second trial for the same offence, whether the accused had suffered punishment or not, and whether in the former trial he had been acquitted or convicted."  *Ex Parte Lange*, 85 U.S. at 169.

---

criminal Causes shall be * * * entred in the rolls of everie Court * * * that such Actions be not afterwards brought again to the vexation of any man.").

[7] In the ancient common law, double jeopardy protection attached only to capital offenses (although most felonies were theoretically at least punishable by death).  *See* 4 W. BLACKSTONE, COMMENTARIES *335-336. While the Fifth Amendment speaks of "life or limb," it is well settled that in its modern form double jeopardy protects against repeated prosecutions for *all* criminal offenses.  *See Ex Parte Lange*, 85 U.S. 163, 170 (1873).

Despite the universal acceptance of the double jeopardy prohibition – or perhaps because of it – ratification-era evidence as to the precise meaning the Framers assigned to the Double Jeopardy Clause is scant, although what is available "suggests that the draftsmen of the Bill of Rights intended to import into the Constitution the common law protections much as they were described by Blackstone." *Jenkins*, 490 F.3d at 873; *see also Currier v. Virginia*, 138 S. Ct. 2144, 2152-2153 (2018) (plurality opinion) ("The Double Jeopardy Clause took its cue from English common law pleas that prevented courts from retrying a criminal defendant previously acquitted or convicted of the crime in question.").[8]

In 1824, the Supreme Court decided *United States v. Perez*, 22 U.S. 579 (1824).   In that case, which the Court would later describe as the "fountainhead decision construing the Double Jeopardy Clause in the

---

[8] The original draft of the Double Jeopardy Clause introduced by Madison in the House of Representatives on June 8, 1789, provided that: "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence." *See* 1 Annals of Congress 343 (1789).  This language was considered insufficiently protective of the rights of criminal defendants because it could have been read to preclude a defendant from suing on a writ of error on his own behalf or from receiving a second trial in case his first conviction was reversed on appeal, *see Jenkins*, 490 F.2d at 873 (Friendly, J.); *see also Green*, 355 U.S. at 202 (Frankfurter, J., dissenting) ("There was fear that as proposed by Madison, it might be taken to prohibit a second trial even when sought by a defendant who had been convicted.").

context of a declaration of a mistrial over a defendant's objection," *Illinois v. Somerville*, 410 U.S. 458, 461 (1973), the Court held that a hung jury did not prevent a retrial of a defendant.  Justice Story, writing for a unanimous court, limned the rule as we know it today:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, *there is a manifest necessity for the act*, or the ends of public justice would otherwise be defeated.  They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.

22 U.S. at 580 (emphasis added).  The *Perez* "manifest necessity"[9] standard has since been consistently applied by the Supreme Court and lower federal courts when addressing a re-prosecution after a mistrial, although the standard has been refined over time.  *See Renico v. Lett,* 559 U.S. 766, 774 (2010) ("Since *Perez*, we have clarified that the 'manifest necessity' standard 'cannot be interpreted literally,' and that a mistrial is appropriate when there is a 'high degree' of necessity.") (quoting *Washington*, 434 U.S. at 506).

---

[9] This language tracks that of Blackstone, who wrote that a jury could not be discharged before verdict "unless in cases of evident necessity." 4 W. BLACKSTONE, COMMENTARIES * 360.

2.  <u>The Modern Approach to Jeopardy and Mistrials</u>

The modern relationship between mistrials and double jeopardy is anchored in a triptych of Supreme Court decisions: *Downum v. United States,* 372 U.S. 734 (1963), *United States v. Jorn*, 400 U.S. 470 (1971) (plurality), and *Illinois v. Somerville*, 410 U.S. 458 (1973).  In *Downum*, the defendant was charged with mail theft and check fraud.  On the first day of trial, a jury was selected and sworn and instructed to reconvene at 2 p.m.  When the jury returned, the prosecution asked that the jurors be discharged because a key witness (the payee on the stolen and altered checks) was not present to testify – he had not been served with a summons as a result of a miscommunication between the marshal and the witness's wife.  Because the witness's testimony was relevant to only two of the six counts of the indictment, Downum moved to have these counts dismissed for want of prosecution and to continue with the trial on the remaining four counts.  The judge refused and, over Downum's objection, discharged the jury.  Two days later, the court called the case again and sought to impanel a second jury.  Downum interposed a plea of double jeopardy, which was denied.  The second jury was sworn, and Downum was tried and convicted.  The Fifth Circuit affirmed the conviction, and the Supreme Court granted certiorari.

In its decision, the Supreme Court observed that "[a]t times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest – when there is an imperious necessity to do so." *Downum*, 372 U.S. at 736. As a limitation on this principle, the Court noted that "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" are clear examples of situations where "jeopardy attaches" and a defendant can raise the previous judicial proceeding as a bar to a second trial. *Id.* Viewing jeopardy as having "attached" the moment the jury is sworn results from the Court's conclusion that "the prohibition of the Double Jeopardy Clause is 'not against being twice punished, but against being twice put in jeopardy.'" *Id.* (quoting *United States* v. *Ball*, 163 U.S. 662, 669 (1896)).

After surveying the case law, the Court, quoting language from a Ninth Circuit case, *Cornero v. United States*, 48 F.2d 69 (9th Cir. 1931)[10], ruled that double jeopardy barred a second trial in Downum's case because the

---

[10] For reasons best known to itself, a Supreme Court majority had previously declined to follow the "*Cornero* rule" in *Wade v. Hunter*, decided fourteen years before *Downum*. *See* 336 U.S. 684, 691 (1949) ("We are asked to adopt the *Cornero* rule under which petitioner contends the absence of witnesses can never justify discontinuance of a trial. Such a rigid formula is inconsistent with the guiding principles of the *Perez* decision to which we adhere.").

prosecutor, when "impanel[ing] the jury without first ascertaining whether or not his witnesses were present . . . took a chance." *Downum*, 372 U.S. at 737. Although recognizing that the rule would bar the retrial of a criminal defendant who benefitted from a prosecutor's carelessness or a witness's unavailability, the Court nonetheless held that "[w]e resolve any doubt 'in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion.'" *Id.* at 738 (quoting *United States v. Watson*, 28 F. Cas. 499, 501 (S.D.N.Y. 1868)).

In the next of the three cases, *United States v. Jorn*, 400 U.S. 470 (1971), the defendant was charged with the preparation of fraudulent income tax returns. On the first day of trial, the jury was selected and sworn and the government introduced the suspect income tax returns through the testimony of an IRS agent. The government's remaining five witnesses were the taxpayers whom the defendant had allegedly aided in preparing the false returns. *Id.* at 473. The trial judge, concerned that the taxpayers had not been adequately warned of their right not to incriminate themselves, discharged the jury, advised the witnesses of their constitutional rights, and declared a mistrial for the stated purpose of allowing the witnesses to consult with attorneys. The case was then set for a retrial before another jury but, upon the motion of the defendant, the judge dismissed the indictment on

double jeopardy grounds. The government appealed, ultimately to the Supreme Court.

The Court, in a plurality opinion authored by Justice Harlan, agreed that the Double Jeopardy Clause barred a retrial. Citing *Gori v. United States*,[11] the plurality noted that a relevant consideration is "which party to the case was the beneficiary of the mistrial ruling." *Jorn*, 400 U.S. at 482. The government argued that "even if [the Court concludes] the trial judge here abused his discretion, reprosecution should be permitted because the judge's ruling 'benefitted' the defendant and also clearly was not compelled by bad-faith prosecutorial conduct aimed at triggering a mistrial in order to

---

[11] In *Gori v. United States*, 367 U.S. 364 (1961), decided two years before *Downum,* the Supreme Court held that the retrial of a criminal defendant was not barred by the Double Jeopardy Clause where the trial judge, on the first day of his first trial, had *sua sponte* dismissed a juror and declared a mistrial. It was not entirely clear what motivated the trial judge's decision – which the Second Circuit had described as "overassiduous" and premature – although the Supreme Court surmised that the judge may have intuited that the prosecution's line of questioning of a witness was leading to the introduction of prejudicial evidence, specifically other crimes committed by the accused, "and took action to forestall it." *Id.* at 365-366. Counsel for the defendant never had the opportunity to weigh in on the judge's decision, apparently because it was taken so hastily. In any event, the Supreme Court, citing *Perez* and *Hunter* and deferring to the district judge's determination that the declaration of a mistrial in Gori's case fit the "manifest necessity" standard, concluded that "[s]uffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest in the defendant, to hold that its necessary consequence is to bar all retrial." *Id.* at 369.

get another day in court." *Id.* The Supreme Court disagreed that the mistrial ruling necessarily "benefitted the defendant." That determination, the Court stated, turned on what the taxpayer witnesses would in fact have said if, after consulting counsel, they had agreed to take the stand. Because the content of their testimony was as-yet unknown, the Court was unable to conclude that "this is a case of a mistrial made 'in the sole interest of the defendant.'" *Id.* at 483 (quoting *Gori*, 367 U.S. at 369).

The Supreme Court determined, however, that the trial judge abused his discretion by declaring a mistrial.

> Despite assurances by both the first witness and the prosecuting attorney that the five taxpayers involved in the litigation had all been warned of their constitutional rights, the judge refused to permit them to testify, first expressing his disbelief that they were warned at all, and then expressing his views that any warnings that might have been given would be inadequate.

*Jorn*, 400 U.S. at 486-487. It was apparent that "no consideration was given to the possibility of a trial continuance; indeed, the trial judge acted so abruptly in discharging the jury that, had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so." *Id.* at 487. As the trial judge had not adequately explored his discretion to determine whether, in light of all the alternatives, there was a "manifest necessity" for a mistrial, the plurality found that a second attempted prosecution would violate the

Double Jeopardy Clause.  Chief Justice Burger concurred, bemoaning the fact that "the case represents a plain frustration of the right to have this case tried, attributable solely to the conduct of the trial judge," and that "[i]f the accused had brought about the erroneous mistrial ruling we would have a different case, but this record shows nothing to take appellee's claims outside the classic mold of being twice placed in jeopardy for the same offense." *Id.* at 487-488 (Burger, C.J., concurring).

The last of the three cases, *Illinois v. Somerville*, 410 U.S. 458 (1973), arose from the prosecution of an Illinois man for theft.  The day after the jury was impaneled and sworn, the prosecutor realized that the indictment was facially deficient under Illinois law because it lacked the allegation that the defendant had intended to permanently deprive the owner of the stolen property.[12]  The trial court determined that continuing the trial would be pointless and granted the government's motion for a mistrial.  The government secured a second indictment and proceeded to trial before a second jury over the defendant's objection.  A post-conviction petition for habeas relief was denied by the district court and the Seventh Circuit.  The *Jorn* decision then intervened, and after granting certiorari, the Supreme

---

[12] Under then Illinois law, an indictment defect was jurisdictional and could not be waived by a defendant's failure to object.

Court vacated and remanded to the Seventh Circuit for further proceedings in light of *Jorn* and *Downum*. The Seventh Circuit reversed its prior ruling, holding that a reprosecution was barred because jeopardy had attached when the jury was impaneled and sworn. Consequently, the declaration of a mistrial over the defendant's objection precluded a retrial under a valid indictment. *See United States ex rel. Somerville v. State of Illinois*, 447 F.2d 733, 734 (7th Cir. 1971). The State of Illinois then appealed to the Supreme Court.

The Supreme Court, invoking the "manifest necessity" language from *Perez*, noted that the standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations during the course of a criminal trial." *Somerville*, 410 U.S. at 462. The Court's principal concern appears to have been a pragmatic one: "[i]f a mistrial were constitutionally unavailable in situations such as this, the State's policy could only be implemented by conducting a second trial after verdict and reversal on appeal, thus wasting time, energy, and money for all concerned." *Id.* at 469. "Here, the trial judge's action was a rational determination designed to implement a legitimate state policy, with no suggestion that the implementation of that

policy in this manner could be manipulated so as to prejudice the defendant."
*Id.*

Despite the defendant's reliance on *Jorn* and *Downum*, the Supreme Court noted that the cases did not stand for the proposition that in *all* instances a defendant has the right to have his trial completed by the first jury impaneled.  Rather, those cases, particularly *Jorn*, had been careful to emphasize the *Hunter* court's admonition that a bright-line rule "would create an insuperable obstacle to the administration of justice," and "what has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just punishments." *Id.* at 470 (quoting *Hunter*, 336 U.S. at 688-689).  Because the delay in proceeding with Somerville's case was "minimal," and because a mistrial was "the only way in which a defect in the indictment could be corrected," the Court could not "say that the declaration of a mistrial was not required by 'manifest necessity' or the 'ends of public justice.'" *Somerville*, 410 U.S. at 469.   The Court concluded with the observation that, "[w]here the declaration of a mistrial implements a reasonable state policy and aborts a proceeding that at best would have produced a verdict that could have been upset at will by one of the parties, the defendant's interest in proceeding to

verdict is outweighed by the competing and equally legitimate demand for public justice." *Id.* at 471.

### 3. Application to the Motion by Garske, Gottcent, and Sedlak

Distilled from these cases and the historical context of the double jeopardy prohibition are several principles that compel the conclusion that a retrial of the three consenting defendants would violate their Fifth Amendment right. At its most basic level, the Double Jeopardy Clause has come to provide protection as much against the ordeal of multiple criminal trials as against the possibility of multiple verdicts. In his opinion for the Court in *Green*, Justice Black, after a learned discussion of Blackstone and common-law antecedents, laid out the first principle in the following passage:

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.
>
>            \*\*\*
>
> Moreover it is not even essential that a verdict of guilt or innocence be returned for a defendant to have once been placed in jeopardy so as to bar a second trial on the same charge. This Court, as well as most others, has taken the position that a defendant is placed in jeopardy once he is put to trial before a

> jury so that if the jury is discharged without his consent he cannot
> be tried again.

*Green*, 355 U.S. at 187-188 (citations omitted); *see also Bartkus*, 359 U.S. at 155 (Black, J., dissenting) ("[T]he basic and recurring theme has always simply been that it is wrong for a man to 'be brought into Danger for the same Offence more than once.'  Few principles have been more deeply 'rooted in the traditions and conscience of our people.'") (citations omitted).

A second basic principle can be extracted from the maxim that "jeopardy attaches when the jury is sworn."  *United States v. Toribio-Lugo*, 376 F.3d 33, 37 (1st Cir. 2004).  This principle reflects the "recognition of the defendant's prized right to have his trial, once under way, completed by a particular trier."  *Id.* (citing *Washington*, 434 U.S. at 503); *see also Crist v. Bretz*, 437 U.S. 28, 38 (1978) ("The federal rule that jeopardy attaches when the jury is empaneled and sworn is an integral part of the constitutional guarantee against double jeopardy.").

Embedded in the rule is the further recognition that "[e]ven if the first trial is not completed, a second prosecution may be grossly unfair" because, among other things, a second trial "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted."  *Washington,* 434 U.S. at 503-504;

*see also Jorn*, 400 U.S. at 479 ("[S]ociety's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in the enforcement of criminal laws . . . . These considerations have led this Court to conclude that a defendant is placed in jeopardy in a criminal proceeding once the defendant is put to trial before the trier of facts, whether the trier be a jury or a judge."); *Currier*, 138 S. Ct. at 2149 ("This guarantee [of the Double Jeopardy Clause] recognizes the vast power of the sovereign, the ordeal of a criminal trial, and the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek.").

Of course, the right of a defendant to see his trial to completion before a single jury is not absolute.  *See Jorn*, 400 U.S. at 480 (noting that "[t]he question remains, however, in what circumstances retrial is to be precluded when the initial proceedings are aborted prior to verdict without the defendant's consent," and further observing that the Court "has, for the most part, explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial").  It is only after a determination that "jeopardy has attached is a court called upon to

determine whether the declaration of a mistrial was required by 'manifest necessity' or the 'ends of public justice.'"  *Somerville,* 410 U.S. at 468.

In applying the *Perez* doctrine of "manifest necessity," a reviewing court will closely examine the trial judge's decision to declare a mistrial, whether alternatives were adequately explored, and the weight of the burden a retrial would impose on the accused.  *See Hunter*, 336 U.S. at 691 ("The value of the *Perez* principles thus lies in their capacity for informed application under widely different circumstances, without injury to defendants or to the public interest.").  And it is here that the rule comes up against the right.  Were the issue to turn solely on the operation of Rule 23, it would be difficult to imagine a necessity more manifest: the Rule plainly dictates that in circumstances like these, a trial cannot proceed with less than twelve jurors without the consent of *all* parties, and that includes the government.

But the issue is more complex than a strictly rule-based analysis would suggest.  While the Rule may excuse the trial judge for declaring a mistrial (at least where there is no practical or feasible alternative), the doctrine also implicates the decision-making of the government.  *Arizona v. Washington*, 434 U.S. 497 (1978), is instructive.  In *Washington*, the trial judge granted the government's motion for a mistrial based on an improper and prejudicial

opening statement by defense counsel.   The Supreme Court found no abuse of discretion on the trial judge's part, as his was the superior position from which to determine "the likelihood that the impartiality of one or more jurors may have been affected by the improper comment."  *Id.* at 511.   The Court did not, however, stop there.   "In view of the importance" of the double jeopardy rights of the accused, the Court continued, "and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar.   His burden is a heavy one.   The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant."  *Id.* at 505.   In other words, because the double jeopardy right belongs to a criminal defendant, where the prosecutor plays a prominent role in bringing about the necessity of a mistrial, the "manifest necessity" standard applies to the government's decision-making with the same force as it does to the actions taken by the trial judge.

So the issue boils down to this.   Can the government, in the circumstances of this case, point to a "manifest necessity" for the withholding of its consent to a verdict by a jury of eleven one day before a month-long trial was coming to an end?   Phrased differently, is it the case that "the ends of public justice would otherwise [have been] defeated," *Perez*, 22 U.S. at

588, had the government proceeded to a verdict with eleven jurors as the three consenting defendants (and the court) desired?

In balancing the interests at stake, two factors seem to me to have particular importance. The first is a temporal consideration: a mistrial declared on the first day of a jury trial is a far less onerous imposition on the rights of a defendant than a mistrial declared after a defendant has endured the ordeal of a multi-week trial. In *Gori* and *Somerville*, for example, in contrast to this case, the mistrial decision came on the very first day of trial. To the extent that "the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial," *Jorn*, 400 U.S. at 485, this interest would seem weightiest after a defendant has undergone the full gauntlet of a criminal trial, and after he has likely shown his hand to the prosecution.

A second consideration, although not dispositive, is whether the government stands to gain (or extract) some "benefit" from the declaration of a mistrial. *See United States v. Glover*, 506 F.2d 291, 297 (2d Cir. 1974) ("[W]here the mistrial is not motivated for the benefit of the defendant, and the defendant has done nothing himself to create the problem, he is entitled to his double jeopardy protection."). *Compare Gori*, 367 U.S. at 366 ("Suffice

that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial."); *cf. Jorn*, 400 U.S. at 483 (extending *Gori* and concluding that "a limitation on the abuse-of-discretion principle based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy the policies underpinning the double jeopardy provision.").

From all appearances, the government's decision to withhold consent was influenced by a desire to submit all four defendants to the jury for a verdict, most probably in the belief that a conviction of all four would be made more likely by the jury's collective consideration.  It appears also to be the case, as defendants speculate and the government more or less concedes, that it was determined to prevent Ackerly from succeeding in her quest for a severance of her case from the others.  Whatever the explanation, it is clear that the three consenting defendants stood to gain nothing from a mistrial, while the government accomplished at least one, and possibly two, of its objectives.

It is true, as the government insists, that a defendant's "valued right" to have his trial completed by the first impaneled tribunal, "must in some instances be subordinated to the public's interest in fair trials designed to

end in just judgments." *Hunter*, 336 U.S. at 689; *see also Washington*, 434 U.S. at 506 (A defendant's double jeopardy rights are "sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.").  But while the principle is sound, the government fails to demonstrate how the public's interest in just punishment would have been threatened had the government agreed to proceed to a verdict against Garske, Gottcent, and Sedlak, and then retried a shorter and simpler case against Ackerly, rather than undertaking another month-long trial against all four defendants.[13]

Here, in withholding consent, the government assumed the risk that the consenting defendants' double jeopardy claim would have merit, as I find it does.  In making this determination, let me make explicit what I have implicitly said in the discussion of Rule 23: the government here did nothing reproachable or in bad faith.  Fully aware of the possible consequences, it simply made a bad gamble, and in the eyes of this court at least, lost.

---

[13] I add that the government, had it consented to proceed against the three consenting defendants, would also have been spared the extra (and unnecessary) burden of defending against a double jeopardy argument that the moving defendants gave fair warning they would make were a mistrial granted.  *See United States v. Ramirez*, 884 F.2d 1524, 1530 (1st Cir. 1989) ("It is important to point out that the court had been advised by counsel of a possible double jeopardy problem prior to its mistrial declaration.").

## CONCLUSION

Garske, Gottcent, and Sedlak's Motion to Bar Retrial under the Fifth Amendment is <u>ALLOWED</u>.  The court further orders that the indictment be <u>DISMISSED WITH PREJUDICE</u> as to these three defendants.  The Clerk will schedule the retrial of defendant Ackerly at the first available opportunity consistent with the court's calendar and agreeable to the parties.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE