UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DONNA M. ACKERLY et al.,<br><br>Defendants. | Cr. No. 16-10233-RGS |

**MEMORANDUM IN SUPPORT OF DEFENDANT DONNA M. ACKERLY'S
<u>RENEWED MOTION FOR JUDGMENT OF ACQUITTAL</u>**

I.  **SUMMARY**

For a wire fraud conviction to stand, the government must prove beyond a reasonable doubt that a defendant knowingly or willfully engaged in a scheme to defraud another of her money or property. 18 USC § 1343. A reasonable jury could not have found that Defendant Donna M. Ackerly committed wire fraud for the reasons stated in her post-trial briefing[1] and herein. This memorandum address two issues.

First, as a matter of law, the proxy voting information is not property that the wire fraud statute protects. The government theorizes that the voting information that Brian Zentmyer prematurely disclosed to Michael Sedlak is Institutional Shareholder Services ("ISS")'s property because it is confidential business information. But the facts established at trial are insufficient to conclude that the voting information from ISS was property for purposes of the wire fraud statute under the framework that *Carpenter v. United States*, 484 U.S. 19 (1987) establishes for confidential business information. And recent decisions by the Supreme Court, Second Circuit, and District of Massachusetts confirm that confidential information is not property unless it has economic value in the hands of the wire fraud victim. The voting information lacked economic

---

[1]  Def. Donna M. Ackerly's Post-Trial Motions, ECF No. 503 ("Post-Trial Motions"); Reply Br. in Supp. of Def. Donna M. Ackerly's Post-Trial Motions, ECF No. 517 ("Reply Brief"); Suppl. Submission in Connection with Def. Donna M. Ackerly's Post-Trial Motions, ECF No. 541.

1

value in the hands of ISS, the ostensible victim, and the voting institutional shareholders. Any conviction based on this property theory must fail.

Second, and moreover, the evidence from trial was insufficient for a reasonable jury to determine that Ackerly knowingly and willfully engaged in a scheme or artifice to defraud. Rather than being a knowing participant, the evidence establishes that Ackerly had co-workers who consistently excluded her from communications that would have given her notice or reason to question the propriety of the information her team was receiving. Any criminal scheme regarding the disclosure of the information was not foreseeable to Ackerly.

## II. RELEVANT FACTS

Ackerly recognizes that the Court is familiar with the evidence in this case, but highlights certain facts that are particularly relevant. Public companies often have multiple questions for each proxy election. The companies cluster their annual proxy votes in a few months, typically in or before June.[2] Institutional shareholders often vote in proxy campaigns for multiple companies in a short period of time. Thus, institutional shareholders have substantial logistical issues in casting their ballots in so many campaigns on so many issues on a recurring annual basis. Because of this, institutional shareholders retained the relevant division of ISS to fulfill a logistical role: delivering shareholders' voting decisions in an efficient manner.[3] ISS delivers an institutional shareholder's voting information to a vote tabulating company. ISS's role is that of a mere conduit, such as a pipeline or other delivery service. Neither the voting shareholders nor the logistics company (ISS) had any economic use for the voting information. Neither one sold the information nor made any stock trading or economic decisions based on it.[4] The ISS general counsel testified that when the Zentmyer-Sedlak relationship became public, ISS did not lose any

---

[2] Trial Tr. Day 2 at 72 (explaining that "most of the shareholder annual meetings occur during a certain number of months in the year").

[3] Trial Tr. Day 1 at 100 ("So, ISS has a separate department, a Voting Service Department, that for certain of its institutional clients it actually issues their vote once a vote decision has been made, issues their vote on their behalf."); Trial Tr. Day 4 at 148 ("So the process to vote proxies is a very cumbersome process, and so we use them to -- we would provide instructions to them about how we're planning to vote, and then they would pass those instructions on to the, ultimately to the issuer, the company that's having the shareholder meeting.").

[4] *See, e.g.*, Trial Tr. Day 5 at 26.

customer or refund any fees.⁵ No shareholder reported any financial loss. The voting information is generally available from other sources, though gathering this was more cumbersome.⁶ Thus, Keith Haynes described using Sedlak's connection to Zentmyer as a "shortcut."⁷ The Zentmyer disclosures were basically a premature disclosure of information that would be discerned from other sources or disclosed by the shareholder during the 30 day vote period, or disclosed by the shareholder after the close of the proxy vote.

### III.   ARGUMENT

Judgment for acquittal is required when "the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *United States v. Lopez-Diaz*, 794 F.3d 106, 111 (1st Cir. 2015) (citations omitted). The evidence at trial, particularly in light of recent decisions, does not provide sufficient support for the government's theory that Ackerly is guilty of wire fraud.

#### A.   THE LABEL "CONFIDENTIAL INFORMATION" IS NOT ALONE SUFFICIENT TO CREATE A PROPERTY INTEREST FOR PURPOSES OF THE WIRE FRAUD STATUTE.

##### 1.   Recent Case Law Confirms that Confidential Information Must Have Economic Value in the Hands of the Victim to Constitute Property.

The Supreme Court's unanimous 2020 decision, *Kelly v. United States*, 140 S. Ct. 1565 (2020), and subsequent cases confirm the requirement in *Cleveland v. United States*, 531 U.S. 12 (2000) that property for purposes of the wire fraud statute must be "property in the hands of the victim." That the victim had and lost (some) control over the item is insufficient, the item must also have been of economic value to the victim.⁸ What may in other contexts be considered clear

---

⁵ Trial Tr. Day 5 at 130 (Q. And did you actually lose any of your clients as a result of this, to your knowledge? A. Not to my knowledge.); *id.* at 136 ("Q. And so, we know nobody tried to sue you under the contract, and nobody tried to sue you outside the contract, correct? A. Correct. Q. And in fact, nobody fired ISS either. A. Not to my knowledge based on this, correct. Q. Nobody asked for a refund? A. That's correct.")
⁶ Trial Tr. Day 1 at 86 (noting there are "four or five methods" for obtaining shareholder voting information).
⁷ Trial Tr. Day 3 at 6.
⁸ In recent briefing and argument before the First Circuit, the government agreed that the "primary traditional hallmarks of property [is]: economic value." Br. for the United States at 21, *United States v. William McGlashan* (No. 21-1421) ("Gov't McGlashan Br."). In *McGlashan*, which has yet to be decided, one of the questions before the First Circuit was whether ACT score reports are property. The government argued that the appellant was misguided in focusing on whether the score reports were conveyed on paper. The proper focus was instead that the "scores are ACT, Inc.'s stock in trade—the good it sells for profit," *id.* at 9, and "nothing about "ACT, Inc.'s economic interests in those reports depends" on the reports being paper rather than electronic, *id.* at 15.

forms of property, including confidential information, are not necessarily property for purposes of § 1341.

In *Cleveland*, the Supreme Court established that an object of fraud may be property in some sense or to some actor, but to "qualify as 'property' within § 1341's compass" it must be "property in the hands of the victim." 531 U.S. at 15. The property at issue—a video poker license—was held not to be property in the hands of the victim—the State of Louisiana. *Id.* The court held that Louisiana's interests in the license was regulatory not economic. *Id.* at 23. Unlike a patent holder, who would be deemed a property owner (even if the patent holder was the government), Louisiana did not conduct video poker "gaming operations itself," it did not "'sell' video poker licenses in the ordinary commercial sense," and could "not sell its licensing authority." *Id.* And Louisiana's interest was distinct from that of a franchisor, who would have a property right to exclude by "select[ing] its franchisees," arising from the franchisor's ownership in an asset such as a "trademark, brand name, business strategy, or other product that it may trade or sell in the open market." *Id.* at 24. Louisiana had "no similar asset" undergirding its licensing. *Id.*

*Kelly* made clear that *Cleveland* was not cabined to government licensing. In *Kelly*, the government claimed that New Jersey officials' decision to close off bridge lanes as a form of political punishment was a violation of § 1341. *See* 140 S. Ct. at 1574. The Supreme Court disagreed. *Id.* Though the bridge lanes certainly were the property of the government, the decision to exclude drivers from using certain lanes implicated regulatory not economic concerns and was not a scheme to obtain property. *See id.* at 1572-73.

*Cleveland's* requirement that the object of the fraud must be property in the victim's hands, that is, the victim must have an economic interest in it, extends beyond cases where there is a government entity that may be acting as a regulator. Following *Kelly*, a session of this Court concluded that "as a matter of law" the government could not sustain a wire fraud conviction on a property theory it advanced. *United States v. Ernst*, 502 F. Supp. 3d 637, 652 (D. Mass. 2020). In *Ernst*, the government alleged that admission slots are the property of universities and that

4

universities had been deprived of that property due to lies surrounding applicants' admission. But the court, analogizing to the Supreme Court's reasoning in *Cleveland* distinguishing Louisiana from a patent holder or franchisor, determined that there was "no argument presented that the universities hold onto admission slots in order to trade or sell admission to the universities in the ordinary commercial sense of the word" or "that when the universities offered the students admission, they also conveyed to the students ownership over the universities' property rights, such as 'a trademark, brand name, business strategy, or other product that [the admittees] may trade or sell in the open market.'" *Id.* at 650-51. The court was "not persuaded that integrity in the admissions process constitutes the universities' 'property' for purposes of the property fraud statute." *Id.* at 651.

This requirement and analysis does not change merely because confidential information is at issue. In *United States v. Blaszczak*, the Second Circuit upheld defendants' wire fraud conviction. 947 F.3d 19, 26 (2d Cir. 2019), *vacated*, 141 S. Ct. 1040 (2021). The defendants had appropriated confidential information on prospective rate changes from the Centers for Medicare & Medicaid Services ("CMS"). *Id.* at 27. This information would have ultimately been disclosed as part of CMS's activities, but the Second Circuit found that the premature disclosure violated CMS's property interest in the confidential information. *Id.* at 34. The dissent, however, concluded that "[l]ike the gaming licenses in question in Cleveland, which the State had the right to control or withhold. . . I cannot agree that a premature disclosure of predecisional regulatory information has taken any property from CMS or the government." *Id.* at 48 (Kearse, J. dissenting). The dissent reasoned that the information was not a "thing of value" to CMS and that "[u]nlike the information that was planned for publication by the news publisher victim in *Carpenter*, information is not CMS's 'stock in trade,'" "CMS does not seek buyers or subscribers," and "it is not in a competition." *Id.* at 47 (citing *Carpenter v. United States*, 484 U.S. 19 (1987)). The Supreme Court vacated and remanded the case back to the Second Circuit

with the instruction to consider the case further "in light of *Kelly*."[9] *Blaszczak v. United States*, 141 S. Ct. 1040 (2021).

Even if the ISS voting information prematurely disclosed to Sedlak and others constitutes confidential information under *Carpenter*, that is not sufficient to establish it is property under § 1341. Neither ISS nor the companies whose voting information was disclosed had a practice of selling the information in any "ordinary commercial sense." They might have sought to control the information and exclude others from receiving it, but this was not because it was related to an asset such as "trademark, brand name, business strategy, or other product that it may trade or sell in the open market." The companies frequently disclosed the information.[10] Georgeson had other ways of obtaining the information.[11] When the institutional shareholders declined to disclose their votes, it was not to preserve or attain economic value. Companies whose voting information was disclosed did not suffer any loss and they did not elect to stop working with ISS.[12] ISS's relationship to the information was merely to deliver it. ISS has no other role or interest in it, and was wholly agnostic to its actual content.

### 2. *Carpenter*'s Focus on Information Which is the Stock and Trade of a Business Does Not Extend a Property Right to any Information Received by a Company and Labeled "Confidential."

*Carpenter*'s classification that confidential information can be a form of property does not obviate *Cleveland*'s requirement that the information must nevertheless be property in the

---

[9] The Second Circuit has heard oral arguments but has not yet issued a decision on remand. It is notable that the Department of Justice did not defend the Second Circuit's decision to the Supreme Court, Mem. for the United States, *Huber v. United States*, 141 S. Ct. 1040 (2021) (Nos. 20-306, 20-5649), and on remand argued against the Second Circuit upholding the defendants' wire fraud convictions in light of *Kelly* because the CMS information was not property, *see* Oral Argument at 30:28-34:11, *United States v. Blaszczak* (Nos. 18-2811, 18-2825, 18-2867, 18-2878), https://www.ca2.uscourts.gov/decisions/isycamsquery/9feeb92c-aecc-42ea-af11-901aeb327a93/1/doc/18-2811%2C%2018-2825%2C%2018-2867%2C%2018-2878-SS.mp3.

[10] Disclosure was directly to proxy solicitors and to management who had hired the proxy solicitors. Testimony at trial established that MFS, a major client of ISS, was not concerned with keeping the information from proxy solicitors when disclosing it to management. Trial Tr. Day 5 at 17-18.

[11] Trial Tr. Day 1 at 86.

[12] *See, e.g.*, Trial Tr. Day 5 at 28. (confirming that MFS did not "terminate the relationship" or "request a refund" when it learned that its voting information was prematurely disclosed); *see also* Trial Tr. Day 5 at 130, 136.

victim's hands.[13] The opinions are consistent with one another. The Supreme Court articulated in *Carpenter* that a business can have a property right in its confidential information, that is, a property right in keeping the information confidential and making exclusive use of the information. 484 U.S. at 26. But *Carpenter* did not establish that merely assigning the label "confidential" to any information possessed by a business fully activates a property right punishable by federal prosecution and up to 20 years imprisonment if transgressed. The property interest at issue, not just the form, must be examined.[14] Both the particular facts of *Carpenter* and the sources that the Supreme Court drew upon to support the property right it articulated are essential to understanding the application and limitation of the right. And they indicate that the ISS voting information is not what *Carpenter*, like *Cleveland* and *Kelly*, contemplated or protected.

In *Carpenter*, the confidential information was the contents of a newspaper column regularly published in the Wall Street Journal. *Id.* at 22. The author of the column disclosed content from his column—perspective and information on stocks—to employees of a brokerage firm prior to the column's publication. *Id.* at 22-23. This information was used to make certain stock trades in advance of the publication of the column. *Id.* at 23. It was the clear practice and policy of the Wall Street Journal that this information (and any information that was gathered for publication) was confidential and not to be disclosed to anyone prior to publication. *Id.* The defendant was well aware of this policy and practice. *Id.* The Supreme Court found that the defendant's premature disclosure of the column's contents constituted a property deprivation punishable under the wire fraud statute because the Wall Street Journal was deprived of its property right to keep the information confidential and make exclusive use of it. *Id.* at 26. The

---

[13] *See* Gov't McGlashan Br. at 18 (providing that *Carpenter* did not prevent the court in *Cleveland* from "consider[ing] whether the licenses were associated with interests traditionally used to define property, such as economic value and the rights of allocation, exclusion, and control").

[14] *Id.* at 20-21 (noting that the "Second Circuit has appropriately identified the relevant inquiry as focusing on interest not form"). The Second Circuit case the government cites approvingly is *Blaszczak*. Ackerly does not dispute that the Second Circuit realized that it must apply *Cleveland* just that its application was incorrect and requires reconsideration in light of *Kelly*. This is further supported by the fact that the government made an about-face in *Blaszczak* and now argues that the confidential CMS information is not property. *See supra* n.9.

7

unique nature of the business at issue here—a newspaper—cannot be overlooked. Indeed, the court noted that for a newspaper, news matter is the "stock in trade . . . to be sold to those who will pay money for it, as for any other merchandise." *Id.* (citation omitted). Selling information is the business of a newspaper. Thus, the information was the saleable property of the Wall Street Journal—the merchandise it produced after investing its enterprise, funds, and skill. To chip away at the exclusivity and confidentiality of that information risked the core of the Wall Street Journal's business and compromised its ability to sell its primary product.

The cases that the Court cited in *Carpenter* to support the Wall Street Journal's property right in its news matter emphasize that the focus of the right is on information core to a business, where confidentiality is necessary and expected.[15] One of the cases, *Board of Trade v. Christie Grain & Stock Co.*, dealt with information on grain prices and future delivery that the plaintiff gathered and disclosed only to recipients who signed contracts agreeing to keep the information confidential, so as to prevent undesired recipients from receiving the information. 198 U.S. 236, 245 (1905). Another, *Ruckelshaus v. Monsanto Co.*, concerned research and test data submitted in support of applications for pesticides. 467 U.S. 986, 997-98 (1984). The information submitted was expensive to gather, had "value to Monsanto beyond its instrumentality in gaining that particular application," was used by Monsanto "to develop additional end-use products and to expand the uses of its registered products," and would provide great value to competitors. *Id.* at 998.

The information disclosed in the instant case could not be more distinct from the confidential information the Supreme Court designated and protected as property in *Carpenter*, *Christie Grain*, and *Ruckelshaus*. There are significant grounds to conclude that the voting information was not confidential. ***First***, unlike, for example, the Wall Street Journal's clear

---

[15] The treatise the Court cited in support of treating confidential information as property also confirms that there are factors that make information confidential: "(1) the protected matter is not generally known or readily ascertainable; (2) it provides a demonstrable competitive advantage; (3) it was gained at expense to the employer; and (4) it is such that the employer intended to keep it confidential." 3 William Meade Fletcher, *Cyclopedia of the Law of Private Corporations* § 857.10 (1994). These requirements mirror the fact-pattern of *Carpenter* and the cases that the Court cited in *Carpenter*, but are in stark contrast to the facts of Ackerly's case.

policy that news matter was confidential information, ISS's clients generally lacked a contractual agreement that their voting information was confidential. ISS's Master Services Agreement advised companies working with ISS that ISS would only treat their non-public information—including voting information—as confidential if companies sent written "notice that the information is confidential."[16] Out of ISS's approximately 1,700 customers the government identified only six who sent notice or otherwise required ISS to keep their voting information confidential.[17] ISS did not own or care about the content of this information. It merely received and organized it for efficient delivery. ***Second***, the voting information lacked other attributes which signify protected confidential information. The information was not the core business of ISS or the companies it worked for.[18] Neither ISS nor the companies sold the information in the market. The information was not distributed based on exclusive contracts. Indeed, there were myriad ways for the information to be obtained, including the shareholders freely providing it.[19]

Ackerly's case presents a unique and narrow factual circumstance where the information is not confidential, and regardless, does not possess value in the hands of any victim. It is not property for purposes of the wire fraud statute.

### B. ANY SCHEME WAS UNFORESEEABLE TO ACKERLY.

The scheme the government claims that Ackerly participated in requires that Ackerly knew (at least) three things: (1) that the information from ISS should not have been disclosed, (2) that bribes were used to facilitate the disclosure of the information, and (3) that charges on invoices were mislabeled to disguise the bribes. The evidence was insufficient for a reasonable jury to find that Ackerly knew any of this. Ackerly incorporates by references the arguments from her prior briefing, particularly in regards to the purported bribes and invoice labeling.[20]

---

[16] Ex. 3003.
[17] *See* Trial Tr. Day 5 at 154.
[18] ISS provided different but distinct services. One unit provided voting recommendations. Zentmyer was not involved in that work. He worked in a different group that compiled and forwarded proxy votes. Trial Tr. Day 1 at 100. The institutional and other investors that worked with ISS were not in the business of monetizing their own voting information.
[19] Trial Tr. Day 1 at 86.
[20] Post-Trial Motions 2-14; Reply Brief 1-3.

Ackerly must emphasize the striking lack of evidence on the first aspect of the government's theory—upon which all of its other claims hinge. The evidence at trial did not establish or allow a jury to reasonably infer that Ackerly had any awareness that the voting information was disclosed through a fraudulent scheme.[21]

*First*, Ackerly did not participate in the conversations between Zentmyer and Sedlak, and Sedlak and other Georgeson employees regarding how or why Zentmyer disclosed the information. Nor did anyone relay those conversations to her. The government submitted an exhibit containing 2,421 pages of correspondence about the information obtained from Zentmyer. Ackerly was neither a part of nor referenced in any of this correspondence.[22] The government further introduced Georgeson correspondence regarding Zentmyer and his information. In 33 of those exhibits Ackerly is, once again, neither a participant nor even referenced.[23] Overall, the government admitted only 92 exhibits at trial. Ackerly never saw the majority of the documents admitted.

*Second*, the conversations show, if anything, an effort to exclude Ackerly from details about and the identity of Zentmyer. For example, in correspondence beginning on June 23, 2011, Sedlak advised Ackerly "You mentioned earlier today that you needed to confirm how Fidelity voted on the Eastman Kodak proposals – my guy at ISS just got back to me saying that FMR voted FOR on ALL."[24] Ackerly replies, "great – thx. Confirms what we gave Kodak."[25] Sedlak then forwards the email to Georgeson employee, Carl Clark—*removing* Ackerly. Clark responds

---

[21] This is not surprising, as it was not protected confidential information for the reasons provided *supra* in Part III.A.2.
[22] See Ex. 1. The admission of this exhibit, the exhibits listed in n.20 *infra*, and the exhibits highlighted in Ackerly's prior briefing demonstrate the prejudicial and improper effect that the testimony of "co-conspirators" had at Ackerly's trial. Ackerly incorporates by reference her arguments on the *Petrozziello* ruling. Post-Trial Motions 12-13, 14.
[23] *See* Exs. 3, 11, 14, 17, 18, 19, 22, 24, 25, 27, 29, 30, 33, 34, 40, 43, 47, 61, 72, 73, 76, 80, 81, 83, 87, 89, 90, 93, 94, 98, 101, 267 and 320. This list does not include exhibits regarding invoices to client, which as detailed in Ackerly's prior briefing, also frequently lacked Ackerly as a correspondent.
[24] Ex. 2 at 36.
[25] *Id.* at 35.

"As always, BZ merely confirms what I already know. Reduce his fee."[26] Others chose to exclude Ackerly from the correspondence in which Zentmyer's initials and the quid pro quo were discussed. Similarly, in correspondence on May 11, 2011, Ackerly, seeking to confirm a vote, advises Georgeson employee, John Carroll, "it would help if [Sedlak] could confirm."[27] Sedlak had numerous sources for information, other than Zentmyer. Carroll then forwards the email to Sedlak—*removing* Ackerly—asking "Do you think you could talk to your guy at ISS?" Ackerly was excluded from correspondence directing Sedlak to use Zentmyer as his source for information.

*Third*, the information Ackerly received and the instructions that she gave indicate only an innocent state of mind. Over the almost five year conspiracy, Ackerly received only a few documents referring to ISS as a source and they were equivocal. Correspondence sometimes references Sedlak's "guy at ISS."[28] Other times, it referred to ISS globally: "I just received some data from ISS,"[29] "I did send a request to ISS,"[30] "I sent ISS a request,"[31] and "confirmed at ISS."[32] The single request from Ackerly for Sedlak to get ISS information on May 11, 2011 does not indicate Ackerly thought there was anything fraudulent or corrupt about the relationship.

The government, aware of this deficiency, resorted to introducing emails that had nothing to do with Zentmyer in an attempt to show that Ackerly should have discerned that the ISS information was improperly disclosed. The government introduced at trial,[33] and raised in its opposition to Ackerly's Post-Trial Motion,[34] correspondence dated June 21, 2011. In the correspondence, Ackerly provides advice to a client on how to explain a director's meeting attendance to institutional investors. The client, preparing to call the institutional investor,

---

[26]     *Id.* The responses by Ackerly and Clark also reinforce that the information provided by Zentmyer was not unique to Zentmyer or confidential. There were alternative ways of obtaining it that the government has not and cannot allege are improper. Zentmyer merely provided a shortcut.
[27]     Ex. 77.
[28]     *E.g.*, Ex. 2 at 25.
[29]     *Id.* at 31.
[30]     *Id.* at 26.
[31]     *Id.* at 10.
[32]     *Id.* at 4.
[33]     Ex. 321.
[34]     Government's Response in Opposition to Defendant's Post-Trial Motions, ECF No. 514 at 8.

Fidelity, asks Ackerly: "Are there things one should or shouldn't say?" Ackerly responds: "Fidelity is a huge proponent of confidential voting so please do not tell them that we confirmed their withhold vote." Ackerly then asks Sedlak to provide the phone number for Fidelity so that the client can make the call. How had Ackerly confirmed the vote? Not through Sedlak or ISS. As noted in the correspondence, Ackerly had reviewed the "Broadridge [voting] data" available on Broadridge's website.[35] Ackerly's instruction that Fidelity liked confidential voting was not an admission that Fidelity's voting information was confidential. Though a person at Fidelity may have preferred a confidential vote, this communication shows that confidentiality was a fiction—a fiction that should be maintained merely as an act of politeness and persuasion.

### IV.     CONCLUSION

The ISS voting information was neither confidential nor an item of value in the hands of ISS (or the institutional shareholders); thus, it is not property for purposes of the wire fraud statute and as a matter of law cannot serve as a basis for conviction. Ackerly was not a knowing participant in any scheme, as she lacked knowledge that there was anything improper about the disclosure of the voting information. For the reasons presented herein and in Ackerly's other post-trial briefing, the Court should enter a judgment of acquittal or other relief requested in Ackerly's motions.

---

[35]     Trial Tr. Day 1 at 58 (explaining that "ISS sends the vote to Broadridge. They're the people who actually count the ballots. . . . If you had [the number of shares] and see the Broadridge results" you could "usually" determine the vote). The government does not claim that reviewing Broadridge's information is improper.

12

Respectfully submitted,

Donna M. Ackerly

By her counsel,

/s/ Michael Kendall
Michael Kendall (BBO # 544866)
WHITE & CASE LLP
75 State Street
Boston, MA 02109-1814
Telephone: (617) 979-9310
michael.kendall@whitecase.com

Date: February 28, 2022

## CERTIFICATE OF SERVICE

I hereby certify that the above document was filed on the date appearing in the header of this page through the ECF system, which will send true copies of the document to the attorneys of record for each party.

/s/ Michael Kendall
Michael Kendall